Please be seated. Thank you. Today, you get the million-dollar trio, not the million-dollar quartet. But Justices Stewart and Justices Hudson had a conflict today and so they will not be present physically here for your oral argument. They, however, have had the benefit of the briefs and they'll have the benefit of the recorded oral argument. We'll be fully participating members of this Court on both cases this morning. With that said, let us proceed. Madam Clerk, please call the first case. 112-889 Margaret Roman v. Billings of Weneca. Counsel, you may proceed. Thank you, Your Honor. May it please the Court. Counsel, Ken Wolf, attorney for Margaret Roman, plaintiff appellant. Brief procedural history. Case was tried before arbitrator Edward Lee, August 19th of 10. He filed his decision on October 22nd of 2010, awarding $13,185.61 in medical, 39.67 weeks of maintenance, and a wage differential benefit commencing on August 20th of 2010. The respondent filed a review and the commission, after oral argument, modified the arbitrator's decision. They reduced the medical award by a little over $1,000, vacated the award of maintenance, and also vacated the wage differential, instead awarding the petitioner 45% loss of her left foot. The petitioner then filed writ of certiorari to circuit court. Judge Gillespie confirmed the commission's decision on March 1st of 2012, and we then filed a notice of appeal to the appellate court March 26th of 2012, bringing us here today. The issue in this case is simple. It's whether the commission decision to vacate the arbitrator's award of maintenance and wage differential benefits is contrary to the manifest weight of the evidence. We submit that it was. I'm going to give you a very brief statement of facts. When I was preparing my statement of facts, I realized that if I went over the medical history of this case, it would use up all of my allotted time. Our brief sets that out, I think, quite thoroughly, but in brief, Plaintiff Appellant, 47-year-old female meter reader for the village of Winnetka, injured January 17th, 2005, undisputed, missed a step in the employee garage, came down heavily on her left ankle, started an extensive course of treatment that started out conservative, ultimately ended up with two surgeries to her left ankle, bone graft and a bone stimulator, and released with permanent restrictions. I count, by my count, 12 doctors involved in this case, including examiners, five of whom were respondent examiners. One of those respondent examiners, George Holmes, who is one of the top podiatrists in the state, became her treater, or one of her treaters. She had multiple treaters, but it was Dr. Holmes who did the surgery on her left foot. The standard of review here is whether the Commission decision vacating the arbitrator's award of maintenance is contrary to the manifest weight of the evidence, and we contend that it was for the following reasons. An opposite conclusion is clearly apparent. This is reflected in the arbitrator's decision. He obviously felt that the contrary conclusion was apparent. It's nicely spelled out in his decision. He had the advantage of observing the petitioner testify under oath before him. Also clearly apparent is the huge raft of evidence in this case favorable to the plaintiff. The opposite conclusion was supported by every doctor in this case, except Dr. Mark Levin, hired defense examiner, and that was on his second bite at the apple. And it was based upon videotapes which we submit are of questionable probative value. Questionable probative value? Yes, sir. You've got a claimant that claims that she's in excruciating, debilitating pain, precluded from working outside or walking for extensive periods of time. If you take a look at the videotape, she displays absolutely no visible evidence of discomfort or an even gait. She appears to be walking normally. During the prolonged sequence, she's observed as she retrieves a large beach umbrella, loads it into a bicycle, places a beach chair on her back, and balances the load while riding six blocks to the beach. She dismounts her bicycle and is seen walking in sandals in the sand near the water with no appreciable sign of pain or discomfort. Now, do you think that the commission could come to the conclusion that she's magnifying her symptoms a bit? I can understand that, but I don't think that they took into account the extremely heavy pain medications that she was on. Also, the videotape was cherry-picked. It was heavily edited. It's only two hours of tape over four different days. It starts and stops. It never shows her resting. It never shows any pain behavior. I admit that. But we cannot know what was left out of the videotape, and that's why I feel that it's not a good basis. It goes to wait out of miscibility, doesn't it? That's correct. And I didn't object to its abysmability. I understand that. So isn't it up to the commission to determine what weight to give that tape? Yes. Not us? Yes, but I think that they were incorrect in the amount of weight that they accorded it. Counsel, at arbitration, did you inquire of your client as to the context of this video, what else was going on at the time? I think there was some indication that maybe she was taking powerful pain medication at the time, so maybe it would have allowed her to do these things, that sort of thing. Did that sort of testimony come out at arbitration? I mean, did you attempt to fill in the blanks? You're saying that there are blanks here because it's heavily, you say, heavily edited. Did you try to flesh out what else was going on during the period of time that the video was taken? I believe we did. It's been quite some time, but I do recall her testifying to the heavy medications that she was on and also the fact that she had to take frequent rest breaks. I mean, that's how you combat a surveillance video, is that you can't have a comparable video showing the other 22 hours of the day being normal or showing what her actual condition is in your mind. But you have testimony from the claimant indicating, well, sure, it showed this, but it doesn't show this. And that's what I'm wondering. If it wasn't done, at least you had the opportunity to do it, and that's something that would have been evidence before the arbitrator for the arbitrator to consider, right? And I believe that's why the arbitrator decided it the way he did. Okay. And the evidence then was in the record for the commission to review via transcript. That's correct. But I believe that they were prejudiced. If you step back and look at this, you see a petitioner enjoying a day at the beach on the insurance company's dime. And that doesn't sound good on its face. I know, but they've been around the block. It's not like you're dealing with a lay jury of 12 individuals. You're talking to the commission. That's true. One particular panel of the commission had quite a few reversals, I might point out. I think Paoletti and Carroll are apt for our position. We think whatever probative value that the video has here is outweighed by the danger of unfair prejudice. When you say unfair prejudice, this isn't the only evidence of symptom magnification in this record, is it? Dr. Levin thought that she was magnifying her symptoms to what was his exact? Her subjective claims were out of proportion to any objective results. She's capable of performing at least at a sedentary-like physical demand. That was back in 2009. So this isn't a situation where the only evidence in the record of symptom magnification is this video tape. No, but you have to remember who Dr. Levin is and what his role is in this case. And that was his second example. You know, we hear that all the time. We hear that all the time. You shouldn't believe this guy because he was a hired IME doctor. Well, you know, that cuts both ways. And the commission knows who these doctors are. They know who's patently believable and who's patently unbelievable. And it's their choice to make it. He may not have decided it the same way, but how can you say there's no evidence in this record that this woman was magnifying her symptoms? I think it's outweighed by the contrary evidence, Your Honor. I certainly understand your point. But Dr. Levin extrapolated from his viewing of the video tape, and he speculated. And we can't rely on speculation. Who's Dr. Friedberg? I'm sorry? Who's Dr. Friedberg? Dr. Friedberg was our examiner. He viewed the video tape, and he came to a different conclusion from Dr. Friedberg. So he's your paid expert. Why should the commission believe him? They don't have to. I think they should throw on both paid examiners and look at the treaters. They didn't believe him, and they believed Levin. So, I mean, you know, the commission knows these people. I'm searching for the question of on what basis would we reverse this when there's evidence of Levin's evidence in the record and the video tape? Well, if we only looked at the quantity of evidence, this would be a no-brainer on behalf of the petitioner because we have so many treating doctors who obviously believed her. We don't look at quantity of evidence. We look at quality of evidence. And I just don't feel that the evidence that the commission relied on is quality evidence. I think if the videos had depicted a day in the life of the petitioner, that would be one thing. Even if it had been two constant hours of activity following the petitioner, I think that would have been relevant. I don't think cherry-picking little snippets of her life. In response to Justice Harris' earlier questions, will a transcript show an attempt by counsel to, through testimony, give that two-hour day in the life? As I recall, Your Honor, and it's been a while since I reviewed the transcript, but I recall the petitioner testifying to the issues that she was experiencing. We should also remember that her primary treater, Dr. Holmes, specifically told her that she could ride her bicycle. So that activity, although it seemed to inflame the commission, was not proscribed. In fact, it was specifically allowed by Dr. Holmes. I think the Modelsky case is in our corner. If the basis of an expert's opinion is grounded in guess or surmise, it is too speculative to be reliable. Dr. Levin extrapolated from looking at minutes of the petitioner walking to say she was capable of excessive walking and thus could do her job as a meter reader where she would have to be on her feet all day long. I think the quote in Modelsky was, we would hardly expect the testimony of an expert witness to be objective in the traditional sense of the word, but neither would we expect it to degenerate to fictional musing. I think that was the exact quote from Modelsky versus Navistar. Correct. I think Dr. Levin bootstrapped his way to the conclusion that he wanted to get to. The other question I have for you is, what do you do about these two FCEs? Well, I thought there were three FCEs and only the middle one hurt us. Well, I think the second one hurts too. The second one. The first one, March 29, 2010, says she could return to her prior position as a meter reader. The second one, on May 13, 2010, at Flexon, says that she is capable of performing at a minimum strength level, which exceeds the light-duty demand level of her prior job. They didn't think that she could return to her prior job because of a limitation on her ankle demonstrated by her limited walking tolerance and limited tolerance to standing without taking a break and subjective complaints of pain. Well, if you buy the fact that she's magnifying her symptoms, we've got an FCE that says that this is a light demand level job and she's capable of doing minimum demand level. I don't know. I just don't buy the fact that she was magnifying her symptoms. I think that given the pain medications that she was on, that there were times when she probably looked normal. And I think the videographer caught some of those times. But I also think that the videographer left out any times when she might sit down or exhibit pain behavior or take a rest. I just feel that Dr. Levin's conclusion was based upon very thin rule. The respondent here attempted voc rehab for six to eight months. Hundreds of employers were contacted. No offers made. They abandoned their effort with no evidence regarding it introduced at hearing and arbitration and no explanation. While they had offered her light duty work in the past, they did not toward the conclusion of her treatment. The petitioner engaged her own rehab firm, EPS Rehab, which concluded she was not currently placeable in full-time gainful employment and said that if she were, her probable earnings would be $8 to $10 per hour. If there are no other questions, I believe that states my position. Thank you, Counsel. Thank you. May it please the Court. Counsel. My name is Brian Rudd. I represent the village of Gwinnettka in this matter. The standard of review before us today is manifest weight of the evidence, specifically whether the three commissioners' unanimous decision that vacated the maintenance benefits and reduced the wage differential to a permanent partial disability award was against the manifest weight of the evidence. My reading of my opponent's brief and after listening to the oral argument, I get the impression that he is attempting to ask this Court to reweigh all of the evidence in the record. As we all know, the purpose of the reviewing court is not to review the evidence found by the commission, not to second-guess the commission's decision, but only reverse an award on manifest weight of the evidence if the opposite conclusion is clearly apparent and the appellee in this matter submits that the opposite conclusion is not clearly apparent. One of the main portions of my opponent's argument was criticism of our surveillance video. The appellant argues that the surveillance performed on July 10th and 11th and September 18th and 19th of 2009 was inflammatory and prejudicial. In support of this allegation, he cited Paoletti versus the Industrial Commission. However, I would argue that this case is not on point. In fact, the appellant concedes in his own brief on page 18 that he's not arguing the loss of the right of rebuttal, as was the case in Paoletti. Here, the petitioner had the opportunity to view the surveillance tape prior to trial. She was asked about it at trial on direct examination. If you look at pages 39 and 40 in the trial transcript, you will see that the petitioner testified very briefly about how some of the surveillance was shot through a window and she claimed that it was taken of her maid mopping instead of her doing any of the mopping work. The rest of the surveillance clearly shows the petitioner engaging in quite a few different activities, including driving, walking, and riding her bicycle that was loaded with equipment to the beach. One of the other arguments my opponent makes is that the surveillance video was just a snapshot in time and that she was on heavy pain medication, which allowed her to perform these tasks. I would argue that the heavy pain medication argument cuts both ways. If you look at the surveillance video, especially the video of the petitioner riding her bike to the beach, she had a beach umbrella strapped across the front of the bicycle. She had a beach chair strapped on her back like a backpack. And she rode a bike. I would submit that if she was on heavy pain medication, such a precarious position on a bike, she wouldn't be able to perform such a task. The fact is the video does show the petitioner performing these tasks and these activities without showing any pain behavior at all. In addition, my opponent argues that the respondent failed to call a witness in order to support the video at trial and that it was inaccurate or inauthentic. However, this — That issue is waived. He made no objection to the admission. That is exactly what I was going to say, Your Honor. Furthermore, the Commission didn't rely solely upon the surveillance video. The Commission actually used three factors in making its decision and vacating the award. Surveillance, Dr. Levin's opinions, and the March 29, 2010, FCE. With regard to Dr. Levin's opinions, he relied on more factors than just the surveillance. He relied on the petitioner's statements. He relied on the medical records and his physical examination in addition to the surveillance video. During the examination, the petitioner made some statements that were contrary to what he viewed in the surveillance video. For instance, the appellant stated that her ankle pain was constantly at a level of 7 to 8 out of 10, which is a high level. If this statement were actually true, then such a high level of pain would be viewed constantly, i.e., during all aspects, including the four days that were taken on the surveillance. At the IME, the appellant also stated that when she stands, that she bears weight only on her right foot. Again, if this statement was true, you would not show any instance of the petitioner bearing weight on her left foot. And if you look at the July 11, 2009 video at 2.22 in the afternoon and 36 seconds, you'll see that she was full weight bearing on her left foot while she was mounting her bicycle. Again, contrary to what she told Dr. Levin. Ultimately, Dr. Levin concluded that the appellant's subjective complaints were out of proportion to any objective findings, including the surveillance video. He ultimately opined that she was at maximum medical improvement. In addition to Dr. Levin's findings, the commission relied upon the FCE reports, and I believe all three FCE reports to some degree are in favor of the employer in this matter. The December 13, 2007 FCE shows near full but not full effort, showed the petitioner performed within the light category, and that her job assessed by that evaluator was also in the light category. The March 29, 2010 FCE shows a valid effort, shows that she performed in the medium category, and this evaluator found her job to be in the medium category. And finally, apparently the petitioner felt that March 29, 2010 FCE was flawed in some way, and so she went out on her own, got an FCE two months later on May 13, 2010. This evaluator found her job to be in the light category and her performance to be in the medium category. There was a secondary statement made that he didn't think she could return to her former job because of her own subjective complaints and self-limiting pain behavior, but once again, based on other sources of evidence, the record shows that the petitioner likely has engaged in symptom magnification. Based upon the above, the commission relied upon substantive evidence in the file and in the record in order to come to its conclusion and make the decision that the petitioner was not entitled to a wage differential and vacated the maintenance benefits. Respondent, based upon these facts, submits that the opposite conclusion is not clearly apparent and would ask that this court affirms the circuit court in its entirety. Thank you, counsel. Counsel, reply? No. Okay, thank you. Thank you, counsel, both, for your arguments in this manner this morning. It will be taken under advisement. The written disposition will issue. Thank you. Thank you, Your Honor. Madam Clerk, please.